SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: FAMILY PART
ESSEX COUNTY
DOCKET NO.: FM-07-1952-14
A.D. # _____

ALINA MYRONOVA,         )
                              )
      Plaintiff,     )
                              )      TRANSCRIPT
      vs.           )         OF
                              )   ORDER TO SHOW
SURENDER MALHAN,     )     CAUSE
                              )
      Defendant.    )

Place: Essex County
      Wilentz Justice Complex
      212 Washington Street
      Newark, NJ 07102

Date: September 12, 2017

BEFORE:

    HONORABLE DAVID B. KATZ, J.S.C.

TRANSCRIPT ORDERED BY:

    AMINA ZAFAR (SpaceAge Consulting Corp.)

APPEARANCES:

    LINDA TOROSIAN, ESQ. (Pashman, Stein, Walder, Hayden)
    Attorney for Plaintiff

    PAUL A. CLARK, ESQ. (Clark Legal Services)
    Attorney for Defendant

              Transcriber:  Laura Scicutella
              PHOENIX TRANSCRIPTION
              796 Macopin Road
              West Milford, NJ 07480
              (862) 248-0670

              Audio Recorded
              Recording Opr: Gwendolyn Chilious

2

I N D E X

PAGE

Colloquy re: Housekeeping                3,19,30,41,45,
                                         57

|                | Direct | Cross | Redirect | Recross |
|----------------|--------|-------|----------|---------|
| WITNESSES FOR THE DEFENDANT: |  |  |  |  |
| S. Malhan | 43 |  |  |  |

ARGUMENTS:

BY: Ms. Torosian                         5,50

BY: Mr. Clark                            13,15,18,20,29,
                                         31

BY: The Court                            14,17,28

THE COURT:

Decision                                 53

(Proceeding commenced at 3:34:38 p.m.)

THE COURT:  Okay, this is docket number FM-07-1952-14 scheduled for three o'clock this afternoon. May I kindly have counsels' appearances and please take a moment to spell your last names for the record.

MS. TOROSIAN:  Yes, good afternoon, Your Honor.  Linda Torosian, T as in Tom, O-R-O-S-I-A-N, with Pashman, Stein, Walder, Hayden on behalf of Alina Myronova, plaintiff.

THE COURT:  Would you spell your name again for me, please?  I missed it.

MS. TOROSIAN:  Sure.  T-O-R-O-S-I-A-N.

THE COURT:  All right, Ms. Torosian, thank you.

MR. CLARK:  Good afternoon, Your Honor.  Paul Clark from Clark Legal Services for Surender Malhan. Clark is C-L-A-R-K.

THE COURT:  Okay, what happened?

MS. TOROSIAN:  Okay, --

THE COURT:  This was set for three o'clock today.  I --

MS. TOROSIAN:  -- I --

THE COURT:  -- think I'm entitled to an explanation.

MS. TOROSIAN:  -- I -- I was stuck in really

bad traffic.  There was a lot of construction and I called in as soon as I realized that I was going to be running --

THE COURT:  Where are you -- where are you coming from?

MS. TOROSIAN:  Hackensack.

THE COURT:  Mmm-hmm.  Okay, I just -- when people are in front of me, especially counsel, I expect there to be cooperation and communication because fees are incurring, --

MS. TOROSIAN:  Sure.

THE COURT:  -- counsel's waiting, and the world's round.  Sometimes --

MS. TOROSIAN:  Yes, sir.

THE COURT:  -- you'll be on time and your adversary will be late.

MS. TOROSIAN:  Right.

THE COURT:  So I do expect cooperation, regardless of the litigants sometimes difficulty of getting -- "getting along," as it were.  Counsel really needs to show courtesy in my court, please, with respect to each other and their schedules.  There are times I'm late, too.  I understand that, but at least I try to give a heads up, okay.

All right, so I just want to see where we're

at.  I have an Order to Show Cause that was entered by Judge Passamano.  Really just a -- kind of a holding pattern, setting it down, more or less, for today.  Mr. Clark, is there any opposition that's been submitted? I want to make sure my file is complete at least.

MR. CLARK:  No, Your Honor, we haven't because, obviously, this was such short notice.

THE COURT:  You're going to handle it on your feet.

MR. CLARK:  I'm going to handle it on my feet.  I do have nine exhibits that I have with me today I would like to use --

THE COURT:  Okay.

MR. CLARK:  -- with the Court's permission, but, obviously, it was such short notice, I -- I wasn't able to -- to file it.

THE COURT:  All right, well, let's take it one step at a time.  I guess I'll hear from Ms. Torosian for the relief you seek and the basis and we'll take it from there.

MS. TOROSIAN:  Okay, Your Honor.  So on Friday, last Friday, Ms. Myronova's parenting time was to begin and --

THE COURT:  All right, pardon if I interrupt you.

6

MS. TOROSIAN:  Sure.

THE COURT:  What is the current parenting schedule?

MS. TOROSIAN:  The current parenting schedule is that Mr. Malhan has the children between -- on Mondays through Fridays while they're in school. Friday afternoons, Ms. Myronova will pick them up from school and she has them until she drops them off Monday morning back at school.

THE COURT:  And how long has that been in place?  Approximately.

MS. MYRONOVA:  Five years.

MS. TOROSIAN:  Five years?  Approximately five years.

THE COURT:  Okay, and I assume, I really shouldn't assume anything, but holidays and things like that are addressed somewhere in this parenting agreement?

MS. TOROSIAN:  There is a -- yes, there is a summer schedule --

THE COURT:  Okay.

MS. TOROSIAN:  -- that's in place when the children are off and there's holiday parenting time as well.  And I just want to make one thing clear.  I -- my firm and I did not join this case until earlier this

year.  That's why I had to defer to my client on --

THE COURT:  All right, so --

MS. TOROSIAN:  -- that.

THE COURT:  -- present purposes, it's presumed through a court order, Monday through Friday, defendant, Friday afternoon, plaintiff picks up from school and she takes back Monday morning and then Friday afternoon -- well, the kids aren't away at school, so he's picking up every day after school. They're with him during the week and her on the weekends?

MS. TOROSIAN:  Correct.

THE COURT:  Okay, all right, continue then, please.

MS. TOROSIAN:  Okay.

THE COURT:  So you were at the Friday the 8th now.

MS. TOROSIAN:  So Friday, apparently they had half a day or so, and so she picked them up and she took them directly to their Court-ordered therapy session and they were in there for about 45 minutes or so.  And according to my client, the therapist comes out and asks to speak with her and informs her that the children had told her that their father had threatened to commit suicide and asked my client whether she knew

about it or -- or if there had been any sort of reports to DCPP regarding it.  So my client discussed some incident that the children had talked to her about -- at one point he had threatened -- apparently he had threatened himself and stated that he was going to pick up a dirty napkin off the floor.  She felt it was kind of like a bizarre story, so she discussed it with us, her attorneys, --

THE COURT:  This is in the past?

MS. TOROSIAN:  This -- this --

THE COURT:  This dirty napkin incident.

MS. TOROSIAN:  About -- about a week or so ago the children had told her this story, correct.

THE COURT:  That he was going to do what with a dirty napkin?  Eat it?

MS. TOROSIAN:  Eat it, yes.

THE COURT:  That's what I saw in the papers.

MS. TOROSIAN:  Right.  So she -- she told us. She felt it was somewhat bizarre, but, you know, we kind of chalked it up to, you know, perhaps it was a joke or something or whatnot.  So she told the therapist.  She relayed her -- you know, this story and that was it.  The therapist said, "Well, I need to discuss it with my supervisor and if we decide we may need to report the incident to DCPP."  And she took her

-- she confirmed her address, name, number to which she said, you know, "If they need to, they may come to the house later on."  She said, "Okay, fine."

So she goes home, she takes the kids home. They're having dinner, doorbell rings, and there are two caseworkers from DCPP.  They then interview the children separately and then they interview, or speak to, Ms. Myronova.  And they explained to her that the children had reported to them that their father had threatened to commit suicide.  Not only did they relay this incident or story with the dirty napkin, but then they also had told --

THE COURT:  Just back up for a second.  The -- the children -- DCPP interviewed the children that evening?

MS. TOROSIAN:  Correct.

THE COURT:  And then spoke to the mother?

MS. TOROSIAN:  Correct.

THE COURT:  Okay, and -- and the mother wasn't there when DCPP spoke to the children; is that correct?

MS. TOROSIAN:  No.  Right?  They --

THE COURT:  She wasn't physically present during that --

MS. MYRONOVA:  I was -- no, I was not there.

THE COURT:  It was in another room I assume?

MS. MYRONOVA:  Yes, yes.

THE COURT:  All right, so then after -- I just want to catch up with you.  Then after the caseworker interviewed the children, she then, the caseworker is a female I assume from the --

MS. TOROSIAN:  Yes.

THE COURT:  -- the --

MS. TOROSIAN:  They were -- they were two females, yes.

THE COURT:  -- from what you were saying, the caseworker then briefs the mother, for lack of a better term.

MS. TOROSIAN:  Correct.

THE COURT:  Okay, and that's what you're telling me now.

MS. TOROSIAN:  Correct.

THE COURT:  Okay, go ahead.

MS. TOROSIAN:  She briefs her and explains to her what the children reported to them, which was not only this incident with the dirty napkin, but this -- another incident -- another incident where apparently Mr. Malhan, this is how it's been described to me, took up a knife and sort of mimicked stabbing himself in the chest.  So they said, "This is very serious and we're

taking it in a very serious manner," and they asked Ms. Myronova what her plan is in terms of keeping the children safe and ensuring their safety. And so she said, "Well, they'll be with me all weekend and, you know, they'll be safe here." And they said, "No, we mean as far as come Monday when they're going to go to school, what's the plan? How are you going to keep them safe?" At which point is when she reached out to us and explained that she wants to keep the children home on Monday from school because the school is aware of the current divorce litigation and has copies of court orders as to parenting time.

So the school is aware that, you know, when Mr. Malhan has custody and when she does, and they won't release the children to the other parent unless it's during their time. So she was concerned that if she dropped the children off at school on Monday, she was not going to be able to pick them up again pursuant to the parenting time order.

So we then decided that we would file an Order to Show Cause in order to ensure that she was not in violation of the parenting time order by keeping the children home and just getting some guidance as to what needs to be done moving forward and seeking the relief that we're seeking. And so given DCPP's concern and

the therapist's concern, we believe that, you know, there has to be at least some sort of risk assessment, some psychological evaluation of Mr. Malhan, before the children can be back in his custody and care because, you know, I understand things -- certain things are said, certain things may be done in jest or joke, but this isn't something that necessarily needs to be joked about in front of children.  The -- they don't understand --

THE COURT:  So this visitation agreement is -- provides defendant will have the children during the week.  Is your client capable to take care of the children during the week?  I'm just curious how we -- how you ended up with this type of parenting plan.

MS. TOROSIAN:  Yes, she is, Your Honor, and I -- I don't know --

THE COURT:  It's not a situation where she's traveling and that's why --

MS. TOROSIAN:  No.

THE COURT:  -- he had them during the week or anything like that?

MS. TOROSIAN:  No, Your Honor, no.  She's here and she is capable of -- of --

THE COURT:  Okay.

MS. TOROSIAN:  -- taking care of them.

THE COURT:  I don't want to say it's an unusual parenting arrangement, but it's one that I thought maybe was done for convenience of parties or something along those lines.  But if I were to suspend visitation, the children would be fine as far as logistically and the like with the mother?

MS. TOROSIAN:  Correct.

THE COURT:  Okay, anything else you wanted to bring to my attention before I hear from Mr. Clark?

MS. TOROSIAN:  Not at this time.

THE COURT:  All right, thank you.  Mr. Clark, what --

MR. CLARK:  Thank you.

THE COURT:  -- say you?

MR. CLARK:  Yes, thank you, Your Honor.  So first of all, not to state the obvious, but the Court has to base its rulings upon admissible evidence.  Obviously, Rule 1:6-6 is very clear.  It must be based on, you know, affidavits of personal knowledge or, you know, otherwise admissible evidence.  I mean, everything we've got is Ms. Myronova's saying someone told her something that someone else told them that supposedly Mr. Malhan said.  So we've got multiple levels of hearsay.  So we -- we even suggest -- first, we would object to -- to all this stuff that she's

simply coming in here and repeating.  We have no way of knowing if it's accurate, if, you know, she's lying about it, frankly, and -- and, you know, we --

THE COURT:  Well, let me -- let me -- I -- I -- before you get to your other points.  We do a lot of work with the umbrellas called Children of Court Docket -- Docket that's Division of Child Protection and Permanency and they often, although it's a state agency, --

MR. CLARK:  Right.

THE COURT:  -- they often act and come into court on hearsay.  You know, when you deal with emergencies with children, you can't always wait until the I's are dotted and the T's are crossed and the Court Rules in that instance and case law provide that the Court can consider hearsay with a quick turnaround time.

But more to the point, we have a Division liaison in the vicinage.  Our staff contacted the liaison and the procedure has been confirmed, not the substance necessarily, that the therapist was greatly alarmed by what had occurred and the therapist did call the Division and the Division confirmed that they went out to the home and that they have concerns and that they are investigating.

What I intended to do today, just to move the argument along, is require the Division get -- get me its report immediately for in-camera inspection.  So while I agree that confronting hearsay is difficult, in this type of situation, I believe I'm -- it's not a removal action, but I believe when we're dealing with emergencies and -- and alleged potential harm to children, Superior Court judges are able to -- to act.  But going a step further, I do have information, and it's not that I've done an investigation *ex parte* before the lawyers came in.  We have -- every vicinage has a DCPP liaison.  Our staff reached out to the liaison because I was hoping to get something --

MR. CLARK:  Right.

THE COURT:  -- so I would have something to see what's going on and I'm told that they have an active investigation.

MR. CLARK:  Okay.

THE COURT:  So you can pick it up from there.

MR. CLARK:  Thank you.  And -- and, again, I understand what Your Honor's saying, but my point is a couple of things, and actually moving towards where Your Honor is going with this, you know, it's not just repeating something the children told them, but she's coming in and supposedly repeating what DCCP (sic) has

told her.  So that -- that's the point where we've got multiple levels.  It would be a simpler case if, you know, if someone were saying, for instance, if she were present and said the children told me most of what she's saying.  She wasn't even present.  She's saying someone else told me something that the children told them that supposedly Mr. Malhan told the children.  So that's the point I'm making.  We've got multiple levels of hearsay.

But -- but another point is really what Your Honor is saying.  DCCP (sic) has mechanisms for handling this.  So, frankly, you know, Ms. Myronova suggests in her certification that somehow DCCP (sic) was going to leave this to her.  And, I mean, Your Honor knows far more about all this than I do, but it strikes me as unlikely.  If the DCCP thought there was an imminent danger, they know how to act.  They know what to do.  They know how to come into court and get something on -- on very short notice.  So, you know, this thing that they told her that she should get a court order, I don't think that makes a lot of sense.

And, you know, again, frankly, there's -- there's all kinds of procedures.  You know, there's the Title 9, there's Title 30, there -- there -- there's various procedures and stages supposed to follow and we

would suggest that's what should happen in this case. You know, there's -- there's protections for Title 9, there's Constitutional rights that are involved in --

THE COURT:  Well, are -- are you suggesting that the children be removed?

MR. CLARK:  No.

THE COURT:  Because that's what Title 9 ultimately can involve.  If children are at risk and the Division gets involved, they do one of two things generally.  They'll remove the child, or children, and put them in foster care or a relative, or they'll enter into some type of safety plan with a parent who is not the target or not the alleged offending parent.

MR. CLARK:  Right.

THE COURT:  So here, again, I don't have the DCC -- DCPP, pardon me, I don't have the DCPP information, but here, there apparently is a parent that is not, at the moment, DCPP's concern with at the moment.  So there would be no reason for them, as I understand it, to come into court themselves and seek a removal or some other type of court endorsement of their action.  If mom, if I may, Ms. Myronova, was not available, then, or if she was part in parcel of an alleged abuse and neglect of a child, then they would come in, and they refer to that as a DODD removal, --

MR. CLARK:  Right.

THE COURT:  -- you've seen in literature or the case law.

MR. CLARK:  Right.

THE COURT:  But in this case, I think the reason DCPP may not be in court is because they have a parent who, at this point, not on their radar screen, so to speak, and, therefore, there's no need for the State to come in and, you know, invoke in a foster situation.

MR. CLARK:  Well, but again, Your Honor, we don't know that.  My point is, you know, we have Ms. Myronova making representation about what DCCP (sic) told her --

THE COURT:  Okay.

MR. CLARK:  -- and I'm saying that that doesn't make a lot of sense to me.  That's not appropriate and my point is simply DCCP knows how to take care of these situations.  You know, they don't have to necessarily work through someone.  So, I mean, obviously, we're not advocating removal, but the point -- again, that's --

THE COURT:  Of course.

MR. CLARK:  -- the point I'm trying to make.  So, you know, and the second thing is, really three

points when you give a broad overview, --

THE COURT:  Ma'am, you can have a seat.  Make yourself comfortable.

MS. TOROSIAN:  I -- I just -- I -- if I may interject, just -- this may help.  So the two caseworkers that had come to the home, --

THE COURT:  Jennifer and Sandra --

MS. TOROSIAN:  Linda --

THE COURT:  Linda Arias.

MS. TOROSIAN:  -- Linda Arias and Alisha -- Alisha Nelson.

THE COURT:  Okay, what's the other one?  Alisha Nelson?

MS. TOROSIAN:  Yes.

THE COURT:  Okay.

MS. TOROSIAN:  While -- my client tells me that while they were there, they're -- Linda's supervisor, --

THE COURT:  Jennifer.

MS. TOROSIAN:  -- Jennifer Wisely, --

THE COURT:  Right.

MS. TOROSIAN:  -- contacted them while they were in Ms. Myronova's home.  And so Ms. Myronova contacted Linda Arias today to see if she would be available to speak to the Court, if the Court was so

inclined to speak to her today at our hearing, and she was not available. But Jennifer Wisely is and she has said she's made herself available for the Court to give her a call. I have her number. She gave me her extension.

THE COURT: Okay, what's the number?

MS. TOROSIAN: Okay, it's 201-823 --

THE COURT: 5500?

MS. TOROSIAN: -- 5500 and it's extension 5585.

THE COURT: Okay, so let me hear Counsel's argument --

MR. CLARK: Okay.

THE COURT: -- and then we can maybe -- bring her in on this new system --

MR. CLARK: Thank you, Your Honor.

THE COURT: -- (indiscernible) if we -- if -- if --

MR. CLARK: Right.

THE COURT: -- (indiscernible).

MR. CLARK: Right, so -- so that's going to be my first point. Again, kind of three points. One is I -- I would certainly want the Court to go to hear from Mr. Malhan, and we'll get to that in a little bit, but he absolutely denies this. He says, you know, this

-- this -- he doesn't know what in the world they're talking about. And, frankly, some of these allegations are so strange, I mean, they -- they almost don't meet the laugh test. Pick up a dirty napkin and eat it? I mean, that -- that -- that doesn't even make sense, frankly. I mean, so, you know, I mean, the knife thing I don't know about, you know. Also a little strange. But, I mean, the dirty napkin doesn't even make any sense to me. I don't know if it makes sense to anybody that -- that -- how that constitutes a, you know, again, he says that doesn't happen, that didn't even happen, but I don't know how you get from even eating a dirty napkin to suicide or, frankly, it doesn't -- doesn't even make a lot of sense to me.

But I did want to, as I said, I -- I -- I have some exhibits. I want to give the Court some background because Mr. Malhan actually has had several psychological evaluations and I want to provide copies of those to the Court. And -- and -- and there's a couple of other things that are -- that I felt --

THE COURT: All right, I'll look at whatever you have.

MR. CLARK: -- (indiscernible).

THE COURT: For sure.

MR. CLARK: So if I could approach, Your

Honor.

THE COURT:  Of course.  Just identify for the record what it is and --

MR. CLARK:  Yes, I'll --

THE COURT:  -- give it to me.

MR. CLARK:  -- do that.  Okay, so this is nine exhibits.  Exhibit 1 is a record, it's two pages, and it's -- it's -- this is the documentation from Orange County and, actually, let me take a step back and explain because the Court's probably not familiar.

Ms. Myronova, a number of months ago, had filed a criminal complaint against Mr. Malhan and a warrant was issued.  He wasn't aware of the warrant at the time and had traveled to New York essentially for a visit to West Point and was actually arrested at West Point on this outstanding warrant.  And he had to spend -- someone had -- someone called the police reporting --

THE COURT:  A warrant for what?

MR. CLARK:  For -- there was a pending warrant in New Jersey --

THE COURT:  For what?

MR. CLARK:  -- for harassment.

THE COURT:  I don't understand.

MR. CLARK:  Or actually for stalking.

THE COURT:  There's a domestic violence case. Is that what you're talking about?

MR. CLARK:  Yes, so --

THE COURT:  So there's alleged -- I mean, I don't know.  Is there a violation of a domestic -- because you don't -- you don't get warrants unless it's a criminal, or quasi-criminal, or --

MR. CLARK:  Right.

THE COURT:  -- a contempt matter.

MR. CLARK:  It's a criminal matter.  The -- the Court, again, he wasn't actually served and then when he didn't arrive, the Court issued a warrant, even though -- whether that was proper or not I won't get into, but that's why a warrant was issued.  So a warrant from New Jersey was issued for Mr. Malhan's arrest.  Again, he wasn't aware of it at the time.

So Mr. Malhan goes with the children to West Point for a few days and somebody makes a phone call. He's arrested on the warrant and he ends up going to jail.  So that's the background.

But the reason I bring that up is that, as I'm sure the Court's familiar, when they arrested him and take him to jail, they do a suicide screening questionnaire and --

THE COURT:  I see.

MR. CLARK:  -- and that's really why I brought this to the Court's attention.

THE COURT:  Okay, I understand.

MR. CLARK:  Okay, so -- so, again, we see on the first page there's a certification.  This a business record, so I would suggest this is certainly admissible as a business record.  And as recently as April 12, 2017, they actually did a screening, suicide screening, questionnaire for Mr. Malhan and, obviously, the Court can look at that.  You know, and, again, obviously, I don't know who Christine Medina (ph) is, but I think the Court is probably familiar that they do have experts do this.  It's not just some guy off the street.  They actually have these professionals.  And so there was a professional suicide screening questionnaire which gave him a clean bill of health as recently as April and that's why I bring this to the Court's attention.

THE COURT:  Okay.

MR. CLARK:  This is the most recent.  So, again, I think this certainly calls into question this theory that -- that he's suicidal.  Obviously, you know, the Court can hear from him directly.  So that was exhibit 1.

Exhibit 2 is actually marked -- or what I

should say is this is something we received recently and -- and I should say to Ms. Torosian we have not yet provided them a copy of this. It actually just came in last week, but -- but, again, this is --

THE COURT: You're talking 2? This came in last week or 1?

MR. CLARK: No, no, exhibit 1.

THE COURT: You're still on 1.

MR. CLARK: Exhibit 1. No, moving on to 2, but Exhibit 1 has not provided and, again, this was -- because this was, again, this was something that came in recently.

THE COURT: Okay.

MR. CLARK: Exhibit 2 is, again, as -- as background, but it directly relates to Mr. Malhan's mental health. So as the Court can see, this was an Order of Dismissal entered by Judge Vito Sciancalepore in Hudson County. So, again, the background of this was Ms. Myronova brought a restraining order against Mr. Malhan for allegedly harassing her and the Court held hearings over I believe it was nine days for -- for harassment and stalking and there -- and wrote a very long opinion that the Court can see. And I've highlighted parts of it for the Court's attention because there's a few things I want to -- I want to

highlight because, again, this was just issued in December.

And -- and Judge Sciancalepore was able to observe Mr. Malhan over -- over, again, I believe it was nine days of testimony, was able to observe Ms. Myronova and Mr. Malhan. And Your Honor can read -- I'm not going to read the whole thing obviously, but Judge Sciancalepore clearly states repeatedly over and over that Mr. Malhan had -- has -- is extremely concerned for his children and says repeatedly that Ms. Myronova's allegations are not credible. You know, she describes, for instance, on page 4, she has something about claiming he was screaming at the children, endangering them, and Judge Sciancalepore said,

"Her testimony regarding this incident was vague and bear on its face. Moreover, the Court does not believe plaintiff's allegation here."

That's the bottom of page 4. Then at the bottom of page 5 he goes on to say,

"Under the circumstances, the Court finds the defendant to have acted pursuant to a legitimate concern regarding the safety and well-being of his children. It cannot be said that defendant acted maliciously."

So, again, safety and welfare of the

children.  And Judge Sciancalepore is going to come back to that.  Over and over he makes this case.  Again, on the bottom of page 11 what I have highlighted, Judge Sciancalepore, again,

"The Court found that after review of the emails and testimony, the Court finds that 246 of the 274 emails were transmitted because of defendant's genuine concern regarding the health, welfare, and safety of the parties' children."

Again, at the bottom of page 11.  So, again, the Court again making a finding that Mr. Malhan is very concerned about the welfare -- health and welfare of his children.

THE COURT:  274 emails?

MR. CLARK:  Well, this is over the course of about six years.

THE COURT:  Okay.

MR. CLARK:  So, you know, again, it's not -- not, you know, quite a long period of time.  So and, again, to get to Ms. Myronova's credibility, the Court repeatedly said that she was not a credible witness.  And -- and, again, my point is that she comes in and repeats stuff and -- and, you know, but she's just not credible about this stuff and she's --

THE COURT:  Well, --

MR. CLARK:  -- been making up --

THE COURT:  -- but, again, if we assume for the moment, and I can get DCPP on the phone, assume for a moment this is not the mother making the allegations, but the children.  I believe when we get DCPP, we'll get them on the phone now, we're going to hear that the therapist is the one that called and that the -- whatever action that the mother is indicating DCPP advised her to take was based on that, on what the children said and what the therapist reported, not what the mother -- so for instance, --

MR. CLARK:  Right.

THE COURT:  -- assume for the moment, without conceding, that the mother isn't credible, and I haven't met the folks, this is the first time they're in front of me, I'm certainly not in any position to make any credibility determinations, but this isn't being -- the genesis of this is not Ms. Myronova.  So where does her credibility come in as far as her -- as far as the application?

MR. CLARK:  Your Honor, I would suggest we don't know what the genesis of this is at this point.  It --

THE COURT:  Well, I'll call DCPP.  We can --

MR. CLARK:  Right.

THE COURT: -- just put that to rest now so we are not under a misassumption. But the assumption I'm under is from what I heard from the liaison is that the therapist called this in and the therapist interviewed the children and the -- and the Division is -- is investigating.

MR. CLARK: Right, and -- and, again, I think the Court should hear from the Division at some point, you know, eventually.

THE COURT: Okay, should we do that now?

MR. CLARK: Well, if I could finish where I'm going then I --

THE COURT: Okay.

MR. CLARK: -- think the Court can better put it in a perspective.

THE COURT: Okay, fine.

MR. CLARK: So, but the point I was making was we don't know what the genesis is because, in fact, you know, this may be Ms. Myronova manipulating the children and talking to them and saying something that leads them to believe that something that -- that Mr. Malhan said is -- should be taken a different way or something. You know, that's why we need to get to the bottom of exactly what was said, when it was said, and so forth.

But, again, I think the -- the point that Judge Sciancalepore is making that in fact she has gone out of her way repeatedly to try to make trouble for -- for -- for Mr. Malhan including this -- this restraining order application that was, obviously, denied.  And -- and, again, on page 17, for instance, where I've highlighted of Judge Sciancalepore's decision.  He says, referring to Ms. Myronova,

"Her response and much of her testimony was highly incredible.  There is no reasonable basis for such a reaction."  It goes on to say, "The Court has judged the credibility of both parties in this case.  In regards to plaintiff, the Court saw her demeanor on the stand, her evasiveness in answering questions, and the Court is very much aware of her interest in the outcome of this case.  The Court finds her responses to be incredible and unreasonable."

So, again, the Court has -- has observed Mr. Malhan, he's observed Ms. Myronova.  You know, the Court has not indicated that Mr. Malhan has been irrational or acting strangely.  You know, if anyone was acting irrationally, he suggested it must have been Ms. Myronova.  You know, and, again, on page 18, the next page, again, the Court says, --

THE COURT:  All right, why don't we move onto

the next exhibit?  If you don't mind.

MR. CLARK:  Okay.

THE COURT:  Because this is an abbreviated Order to Show Cause.  I understand --

MR. CLARK:  I understand, Your Honor.

THE COURT:  -- the point that there's more of it.  Not being rude.

MR. CLARK:  Yes.

THE COURT:  There's -- there's more instances in the transcript of the judge siding with the defendant on credibility basis -- bases and --

MR. CLARK:  Yes.

THE COURT:  -- deciding against the plaintiff.

MR. CLARK:  Yes.

THE COURT:  Okay, I -- I -- that's --

MR. CLARK:  Okay.

THE COURT:  -- that's -- that's been established for the present purposes.

MR. CLARK:  Thank -- thank you, Your Honor. Okay, so, and, again, I'll try and be fairly quick.  So Exhibit 3 is a -- again, this is actually exhibit D-128, which has been pre-marked for trial because Your Honor knows this has been pending for some time.  We've had a couple trial dates.  This is a letter from Ms.

Myronova's mother, Victoria Myronova.  I'm sorry, from her counsel.  From the counsel for Victoria Myronova, who's the mother of Alina Myronova.

THE COURT:  So the maternal grandmother has counsel in this case?

MR. CLARK:  Yes.

THE COURT:  Okay.

MR. CLARK:  Okay, and I can go into that if the Court needs me to fill in more --

THE COURT:  I don't know yet, but -- so what's the point of the --

MR. CLARK:  Okay.

THE COURT:  -- letter though?

MR. CLARK:  The -- the point of all this was back in 2003 when I first got involved we were able to subpoena --

THE COURT:  2013 or 3?

MR. CLARK:  I'm sorry.  2013, Judge.

THE COURT:  Okay.

MR. CLARK:  Did I say -- 2013 we subpoenaed records from the bank and we found the records provided by Ms. Myronova, Ms. Alina Myronova, in discovery had been falsified and we presented this to the Court.  And -- and then what happened was Victoria Myronova's counsel got an email from Ms. Myronova saying, "Yeah, I

did it." And that's actually here as part of exhibit 3.

THE COURT: So the purpose of exhibit 3 is that the plaintiff in this instance -- in this instance allegedly had some type of forged documents.

MR. CLARK: Well, she actually has admitted it. She -- so --

THE COURT: She actually admitted to forged documents?

MR. CLARK: She admitted it. In Judge Sciancalepore's decision, he talks about this also, that --

THE COURT: Okay.

MR. CLARK: -- she's admitted to committing a crime. So the point I'm making is simply she's shown that she's willing to actually go out there and actually commit crimes to try and hurt Mr. Malhan.

THE COURT: Okay.

MR. CLARK: So, you know, again, --

THE COURT: That's exhibit 3?

MR. CLARK: That's exhibit 3.

THE COURT: Okay, let's go to 4.

MR. CLARK: Thank you, Your Honor. So exhibit 4, again, I can be brief, but this was an affidavit we received from Ms. Myronova's former

employee -- actually a former employer.

THE COURT:  Employer.

MR. CLARK:  Employer.

THE COURT:  What kind of work did she do?

MR. CLARK:  She worked for some sort of a computer consulting firm similar to -- to what Mr. Malhan owns.

THE COURT:  Okay.

MR. CLARK:  So this was a computer firm.  It was called DaVinci Technology.

THE COURT:  All right.

MR. CLARK:  And, again, I -- I won't devote a lot of time, but essentially this -- this Elaine Murtagh contacted me in 2013 and says she was very concerned that Ms. Myronova had been making comments that she wanted to frame Mr. Malhan for a crime and, again, we have a sworn statement from Ms. Alina Myronova's employer saying she's talking about trying to frame him for a crime.  So, again, we see the extent --

THE COURT:  So she's talking to her boss that he -- Mr. --

MR. MALHAN:  Malhan.

THE COURT:  -- Malhan is working for a different company, --

MR. CLARK:  Yes, he --

THE COURT:  -- but the -- the substance of docket 4 is that -- exhibit 4 is that the plaintiff apparently had discussions with her employer of ways to frame the defendant?

MR. CLARK:  Yes, Your Honor.

THE COURT:  Okay, understood.

MR. CLARK:  So exhibit 5 is actually pretty straight forward.  This was actually an order to show cause that Ms. Myronova filed in 2011.  This is actually goes way back to the start of the case.

THE COURT:  Now, this is all in Hudson County.  So at some point was this -- this case started in Hudson and was brought to --

MR. CLARK:  Yes.

THE COURT:  -- Essex?

MR. CLARK:  It -- it started in Hudson and it was transferred to Essex for reasons I can --

THE COURT:  Okay.

MR. CLARK:  -- get into if the Court is -- it doesn't really -- important --

THE COURT:  Eventually.  I'll slow you down.

MR. CLARK:  So in any case, it was -- it was transferred to Hudson I believe in 2014, early 2014.  But in any case, Your Honor, again, I just have this

for background.  So Ms. Myronova in 2011 had demanded that she be given full physical and -- and legal custody of the children in 2011, which -- which actually the Court did grant and ordered Mr. Malhan to undergo psychological evaluation.  So that -- that's all in this order.

And then as a result of that, obviously, exhibit 6.  So Mr. Malhan then had -- the Court -- because the Court had ordered him to have psychological evaluation in 2011.  So he had not one, not two, but three different psychological evaluations and those are, again, exhibit 6, 7, and 8.

THE COURT:  No, it looks like 7 is psychiatric, not psychological.

MR. CLARK:  Okay, well, --

THE COURT:  Right?  Report of psychiatric, that's an MD.

MR. CLARK:  Okay.

THE COURT:  So we have a Dr. Abrams, --

MR. CLARK:  Yes.

THE COURT:  -- Ph.D.

MR. CLARK:  Yes.

THE COURT:  Dr. Johnson-Sena, M.D.

MR. CLARK:  Yes.

THE COURT:  And Dr. Turco, M.D.

MR. CLARK:  Correct, Your Honor.

THE COURT:  Who I presume did a psych -- psychiatric.

MR. CLARK:  Right.

THE COURT:  Yes.

MR. CLARK:  Right.

THE COURT:  And I'll just note that the -- reading the first -- third sentence of Dr. Turco's says,

"Mr. Malhan reports a psychiatric history that is significant for a psychiatric hospitalization at the military hospital," I'm apologize, I don't know where that is, "in 1992 for a period of three months."

Okay.

MR. CLARK:  Right, so -- so that actually -- I believe they go into that, but what was --

THE COURT:  All right, but you're going to tell me that the bottom line --

MR. CLARK:  Okay.

THE COURT:  -- of these three --

MR. CLARK:  Well, the -- the --

THE COURT:  -- evaluations is that there was no concerns?

MR. CLARK:  Right, the bottom line of the three evaluations, all three of them concluded that Mr.

Malhan had -- had no psychiatric problems or symptoms

or -- so, for instance, again, the bottom of page 8

where Dr. Turco -- Your Honor was referring -- I'm

sorry, that's the same line.  Bottom of page 8, it

says, "Recommendations:  1, Mr. Malhan," --

THE COURT:  Right.

MR. CLARK:  So all three of --

THE COURT:  I was just reading it.

MR. CLARK:  Right, all three of them

concluded that he had no psychological problems.

THE COURT:  Okay.

MR. CLARK:  So, again, I think those are

fairly straight forward.  Your Honor can, obviously,

read them for yourself.

THE COURT:  In fact, one of them, I mean, to

be fair, one of them even says, wait a second, he's

fine, but she should be evaluated.

MR. CLARK:  Well, I think two of them

actually say that, Judge.

THE COURT:  Okay, well, I'm not at the second

one yet.  Okay.

MR. CLARK:  So, yeah, so on the bottom of

page 8 (indiscernible) it says, "In my opinion, the

Court should consider Mr. Malhan's concern about his

wife."  So, yes, and then -- and 8 I think may say the

39

same thing.  So 8 is a two-page.  Obviously, the different people, --

THE COURT:  Okay.

MR. CLARK:  -- different things, --

THE COURT:  All right.

MR. CLARK:  So, again, I -- I -- I -- I want -- I think the --

THE COURT:  All right, okay, and then what was --

MR. CLARK:  -- Court should be aware that --

THE COURT:  -- exhibit 9 here?

MR. CLARK:  Yes, so exhibit 9, again, is pretty straightforward.  This is just a small part of a transcript for -- this was sort of the outcome of all this.  Obviously, Mr. Malhan was -- did not have --

THE COURT:  This is the return of the Order to Show Cause or something --

MR. CLARK:  Well, it's actually --

THE COURT:  -- along those lines?

MR. CLARK:  -- what -- what happened was Your Honor was asking how long this parenting -- so this was actually when the current parenting time (indiscernible) was put into effect.

THE COURT:  Because this was done by Judge Sogluizzo; right?  So --

MR. CLARK:  This was -- right, this was Judge Sogluizzo.

THE COURT:  -- so this plan's been in place a long time then.

MR. CLARK:  Yes.

THE COURT:  Okay.

MR. CLARK:  This has been in place since August 2012.  And, again, I'll just call Your Honor's attention.  It's pretty straightforward that she -- she just talks about Mr. Malhan from the beginning was asking for equal custody, 50/50, and, you know, Ms. Myronova had opposed that and, you know, the Court says on the record -- let's see if I can find the provision -- at the top of page 31.  Again, this is just the Court -- this is just kind of summing up the whole thing.  The Court says,

"THE COURT:  And nothing changed from Mr. Malhan's behalf in January of 2010, maybe it was 2011 until now.  Nothing changed for him.  His life didn't change.  (Indiscernible), he didn't get any better or any worse.  He's the same person who came in front of me in January 2011."

So, again, I think this is the Court expressing, you know, his confidence that, you know, they went through this process.  He was denied equal

custody for -- for almost a year and a half and -- or maybe even more than that if it goes -- I guess it goes back to February now.

THE COURT:  So this looks primarily for money.

MR. CLARK:  Well, right, the --

THE COURT:  Some adjustments of $11,000 and the like.

MR. CLARK:  Right, the background of this was Ms. Myronova had -- had kept money that was not supposed to go to her, but, again, I won't -- we didn't know that.  But the point I want to make for the purpose of this hearing is, again, the Court was -- was obviously satisfied with these -- these things and it's pointed out that Mr. Malhan wanted to have custody of the children and, you know, he had to fight for -- for about a year and a half.  Finally, Ms. Myronova agreed to have them 50/50 custody and that's the plan that's been in effect.

So, again, this isn't, obviously, everything we could present, but I think this is the -- kind of the nutshell background that I want the Court to be aware of.  And then, finally, I would just ask Mr. Malhan, I want -- I believe the Court should hear in his own words when we've said -- I obviously told the

42

Court before he's denied on this, but Mr. Malhan just --

THE COURT:  Officer, would you kindly administer the oath of affirmation?

COURT OFFICER:  Yes, Judge.  Sir, raise your right hand.

S U R E N D E R   M A L H A N, DEFENDANT, SWORN

COURT OFFICER:  State your full name for the record.

MR. MALHAN:  Surender Malhan.

THE COURT:  All right, please have a seat. Make yourself comfortable.  Forgive the questions.  I just want to make sure you speak and understand English?

MR. MALHAN:  Absolutely.

THE COURT:  Okay, fine.  Just have a seat. Make yourself comfortable.

MR. MALHAN:  Thank you.

THE COURT:  We ask that of all witnesses.

MR. MALHAN:  If you don't mind, I have a back problem.  I'll just stand.  It relaxes me.

THE COURT:  The most important thing to me is that you're comfortable, so --

MR. MALHAN:   Yes, thank you, Your Honor.

THE COURT:  -- if you're comfortable

standing, you may remain standing.

MR. CLARK:  Thank you, Your Honor.

DIRECT EXAMINATION BY MR. CLARK:

Q    Okay, Mr. Malhan, again, this is not a long proceeding, but there's a couple of allegations in the complaint.  So one is about a dirty napkin.  Did -- did -- is there any truth to this allegation about you trying to eat a dirty napkin to kill yourself?

A    Absolutely not, Your Honor.  Absolutely not.

Q    Do you -- any idea what we're talking about here?

A    Absolutely not.

Q    Okay, the other allegation they talk about is something with a knife.  Was there ever any time where you took a knife and pretended to stab yourself?

A    Absolutely not.

Q    Do you have any idea what this is talking about?

A    The only idea I can get is we attend karate sessions together and as part of karate training sessions, my son said, "Yes, let's buy," because when we go for karate, they tell you that, okay, yes, you must buy some nunchuckles (sic), you must buy some practice nunchuckles and practice wooden (indiscernible) knives.  So I practice with my son

that, okay, this is how we defend yourself from sudden moves, there's other things.  That's all.

Q    Okay.

A    I don't know anything else about the -- the --

BY THE COURT:

Q    So what -- what's -- you -- you use nunchucks, which I understand what they are.

A    Yes.

Q    Those are two pieces of wood --

A    Nunchuckles (sic).

Q    -- with a --

A    Those two things, yes.

Q    What is --

A    The other karate session --

Q    -- the knife --

COURT OFFICER:  Wait your turn.

BY THE COURT:

A    Pardon?

Q    What are the knives you're referring to in karate?

A    Wooden -- they're wooden practice knives for same difference.

Q    Wooden practice knives?

A    Yes, wooden practice knives.

Q    Okay.

A    I don't keep long, sharp knives at my house.  I'm very careful about that.  Any arms, nothing, no arms, nothing.

THE COURT:  Very well.

BY MR. CLARK:

Q    Okay, and just, finally, Mr. Malhan, have you ever threatened to kill yourself in the presence of your children?

A    Never.

MR. CLARK:  Okay, again, --

MR. MALHAN:  Never.

MR. CLARK:  -- if Your Honor has questions, again, I really just wanted to --

THE COURT:  Well, just -- just to complete the record, I'll ask -- invite counsel, Ms. Torosian, if she has any questions.

MS. TOROSIAN:  Of Mr. Malhan?

THE COURT:  Sure.

MS. TOROSIAN:  No, Your Honor.

THE COURT:  All right, thank you, sir.  You may be seated or you can stand if that's more --

MR. MALHAN:  Thank you.

THE COURT:  -- comfortable for you.  All right, I think at this point -- let me -- I have no problem calling -- it's -- it's Linda or Jennifer?

It's Jennifer?

MS. TOROSIAN:  Jennifer, Your Honor.

THE COURT:  Yeah, we'll see if we can get her on the phone and -- and maybe that will help put some light on some of these -- on the situation.  So it's 201-823-5500 please, extension -- I guess wait until they answer.  Okay, maybe if you dial 1 first.  Don't do that.  Okay, 5585.

COURT CLERK:  5585.

THE COURT:  Thank you.

(Pause in Hearing)

UNIDENTIFIED FEMALE:  (Indiscernible).  Can I help you?

THE COURT:  Hi, is Ms. Wisely available, please?

UNIDENTIFIED FEMALE:  (Indiscernible).  Can I help you?

THE COURT:  Yes, good afternoon.  My name is Judge Katz, Superior Court of New Jersey in Essex County.

UNIDENTIFIED FEMALE:  Hi.

THE COURT:  How are you?

UNIDENTIFIED FEMALE:  Good, thank you.

THE COURT:  Thank you.  I'm just looking to speak to speak to Ms. Wisely.  She had indicated we can

47

give her a call at this number at this time.

UNIDENTIFIED FEMALE:  Okay, let me page her.  I'll page her for you.

THE COURT:  Thank you, so much.

(Pause in Hearing)

THE COURT:  While we're waiting, counsel, I'd like to also -- one second.

MS. WISELY:  Hello?

THE COURT:  Hi, Ms. Wisely?

MS. WISELY:  Yes.

THE COURT:  Hi, my name is Judge Katz, David Katz, K-A-T-Z.

MS. WISELY:  Hi, how are you?

THE COURT:  Good.  Superior Court of New Jersey.  I sit in Essex County.

MS. WISELY:  Yes, for Myronova.

THE COURT:  Yes, and they're actually in court now and I have you on the record.  I hope you're comfortable with that.

MS. WISELY:  I'm actually not comfortable with that.  We're --

THE COURT:  Okay.

MS. WISELY:  -- not supposed to get on the record without an attorney present.  However, I did make sure that my worker created a court report in case

you guys called. So I would be able to fax that over right now for you.

THE COURT: Okay, and I'm going to look at that in-camera, okay. Is that how you prefer I proceed with that or is it available for the parties?

MS. WISELY: No, it's just for you.

THE COURT: Okay, very well.

MS. WISELY: If -- if you -- I mean, if -- obviously, you can just, you know, make that determination, but it is -- we would prefer that you just keep it for yourself.

THE COURT: All right, and are you prepared -- can you email that to me or you prefer to fax it?

MS. WISELY: I can fax it right over. I mean, it should be there within, like, not even five minutes.

THE COURT: Okay, so just give me a second because we don't email (sic) to us frequently, so I just need to get our email (sic) number, okay.

MS. WISELY: Okay.

THE COURT: I mean, I'm sorry. We don't fax to us frequently, so I just need to get my fax number. So just wait a second and we'll have that for you, okay.

MS. WISELY: Okay, thank you.

THE COURT:  And we have it now.  973 --

COURT CLERK:  693 --

THE COURT:  -- 693 --

COURT CLERK:  6721.

THE COURT:  -- 6721, okay.

MS. WISELY:  6721.  Okay, I'll put it through right now.  Should I put it to, like, a clerk's attention or --

THE COURT:  No, --

MS. WISELY:  -- you (indiscernible) --

THE COURT:  -- Judge Katz.  It's -- it will get to me.

MS. WISELY:  Okay.

THE COURT:  We have it actually.  We have it. I -- I -- I must tell you I am familiar with the protocol, but I thought that was more for the Division matters.  But I certainly respect that the Division wants their DAG deputies on the phone.

MS. WISELY:  Right.

THE COURT:  I'm very familiar with that process.  We certainly respect it, but of course this isn't a DCPP-initiated matter, at least not at this stage.  That's why I --

MS. WISELY:  Right.

THE COURT:  -- took it upon myself to reach

out to you, but I'll look for your report and I thank you for your -- getting that over to us.

MS. WISELY:  Okay, I'm going to send it through right now.

THE COURT:  Okay, thank you.

MS. WISELY:  Thanks.

THE COURT:  All right, so -- I did that last time as well.  Okay, fine, so, counsel, let me take a look at that.  In addition, while we wait the five minutes for that report, I should -- I wanted to see if there's anything else anybody wants to bring to my attention.  You didn't have a chance to reply or if there's anything else and then there's something I certainly want to add as well.

MS. TOROSIAN:  Okay, just I would like to say that, you know, we came in on this application on a very limited basis and -- and based it upon something very limited, which was information that was relayed to Ms. Myronova from a therapist, from the children's therapist, and DCPP caseworkers.  I, myself, don't really see the relevance in going back for six years of history.  We very well can -- if we -- if we tried to do that, we would literally be here all week.  There are many things that I could point out on behalf of Mr. Malhan that would speak to, you know, his mental

wellness or -- or mind frame or whatnot, but it's not relevant here.  The -- the -- the reason why we're here is based upon what DCPP caseworkers relayed to Ms. Myronova and what the therapist did.

I would, without going through each exhibit, like to just note, first of all, many of these reports are old.  Even the one that's most recent was from I believe April 2017, that suicide screening questionnaire.

THE COURT:  That's old?

MS. TOROSIAN:  It's old if you are -- yes, if -- so if in April you are reporting that you do not have any suicidal thoughts on that day, that doesn't mean that in --

THE COURT:  Well, --

MS. TOROSIAN:  -- August you are not feeling differently.

THE COURT:  Yeah, I just want to note one thing also on exhibit 1.  It's not only self-reported. I was looking at that as well.  So some of it is self-reported, but not all of it, though.

MS. TOROSIAN:  And then also, you know, this, as Mr. Clark pointed out, we don't know who Christian Medina (ph) is, --

THE COURT:  Mmm-hmm.

MS. TOROSIAN:  -- but typically if someone were to be licensed in a mental health field, you'd have some sort of abbreviations or something after their name indicating such.  There is nothing like that, so we don't even know what qualifications this person has other than just reading a questionnaire and going through the questionnaire.

But aside from that, as I said, the other reports are, you know, first I would need to read them to see exactly what it is stating because, as Your Honor pointed out, there were a couple of things in there.  One of them, at least in the first couple of lines, discussed some sort of psychiatric history of Mr. Malhan's.  So those reports would need to be go through -- would need to be read through thoroughly to understand exactly what it is that they're recommending.  You can't just read, you know, a couple of lines pulled out of it.

And as far as the employer's affidavit, I just would like to know, I wasn't in the case at that time, but from what I understand, the employer, after providing the affidavit made it very clear that she didn't want it to be used and she didn't want to be called in to, you know, testify on -- on that affidavit.  And I believe this was relayed to Mr. Clark

through -- through an email and so she basically stated that she didn't want the affidavit to be used.  And so that indicates to me that there may be some issues with what she had put in there.  Why wouldn't she want it to be used if there's no reason and everything in there is, you know, forthright and exactly the way that it happened?

And insofar as the transcript, it's literally just two pages, you know, to add upon text.  We would need the whole thing to fully grasp exactly what it is that the Judge had indicated as far as the things that Mr. Clark pointed out and used it to indicate.  And that's -- that's it.

THE COURT:  Okay, thank you.  Okay, thank you.  All right, Court has received a confidential one-page, page and a third, report outdated, referred to as DYFS, not DCPP, as indicated by the individual on the phone.  And -- and the Division is indicating that they will be undertaking a psychological assessment for the biological father.  They also indicate that they met with the biological father.  He denies these allegations and he agreed to do a psychological evaluation.  And the Division is undergoing an investigation.

The Court is not able, at this point, nor is

it appropriate at this point, to get into a credibility assessment. There is, obviously, a very extensive history in this case. It's a 2014 docket. I'm not sure when the complaint was filed, but certainly several years ago. I -- I will be trying this case. I'm going to talk to the parties in a few moments about it. So this divorce, probably one of the oldest in the vicinage, perhaps. Anybody know the date of the complaint?

MR. CLARK: It's February 2011, Your Honor.

THE COURT: 2011. Okay, so, obviously, this has been going on a very long time and I'll see if I could help the parties get to a point where we can get this case tried and resolved.

The Court is -- is concerned because I have allegations and -- and the allegations are not raised by the biological mother. So even if the biological mother is deemed incredible, that's certainly not before me today, it's not of moment because the Division has interviewed the children and they want to have the father assessed and they'll move quick. And I think it would be -- I think I'd be remiss if I didn't give the Division its opportunity to complete this investigation. That's what they do and they're (indiscernible), my estimation, thorough and they

should be given the opportunity.

Again, this is not a Ms. Myronova-generated report, at least at this point. There's no indication that she, you know, discussed with the children and planted this in their mind at this point. There's nothing like that in front of me.

And, again, I think the Court would be remiss if it has Division concerns articulated to the Division by a child and the Division wants to conduct an investigation -- and is conducting an investigation and wants to have a psychological assessment, that the Court not consider that serious and not grant some type of temporary relief.

I will tell you that we'll move quick on this and I will tell you that any visitation that has been lost will be made up somehow if, as, and when we get to that point. But I think any judge, frankly, that has these type of allegations that are raised is obligated to let the Division do what they do. This isn't a runaway train. I suspect they'll have this done hopefully within, at the outside, 30 days. It sounds like the father's already agreed. You know, he's moving quickly to get this resolved. I don't -- not making any pre-judgements. I don't know what it's going to show, but I think I'll have more of a

substantive understanding of what, if anything, happened and what, if anything, I need to do after that evaluation.

So the Court, again, understands that this is a very contested matter and that -- that, again, have been ongoing for quite a long time and there's an extensive history here. I'm in no position to discuss who's the party that's at fault or anything along those lines at this point. It's really not a relevant consideration for us on this emergent Order to Show Cause. I find that the relief sought is limited. It's temporary. It's only until the Court's able to make an assessment based on the report I got from the Division.

I'm going to order the Division to provide me its report forthwith and I will set this down for a return date, on the outside, 30 days, but as soon as I get the Division's report, I'm going to have the parties in here the next day. We're not going to keep -- I don't keep a parent away from a child a day longer than necessary, but I feel in this instance, based on the allegations as communicated not by Ms. Myronova. And not that if it was communicated by her, it's necessarily incorrect, but I don't have to go there on this record. It's not communicated by her, so I have to consider it and let the Division do what they do, as

difficult as it is for the defendant because he has denied it, doesn't understand the basis of it.  And, again, I wasn't there and so I rely on the Division, who knows how to investigate these type of instances and they will do what they do and I'll give them 30 days and I'll tell the parties that as soon as I get that report, I'm going to want you in here, you know, in a day or two thereafter.  But it would be the order of the Court that pending further order, with a very short return date, that defendant's visitation has to be suspended temporarily pending further Court order.

And, Counsel, I don't know if you have another Order to Show Cause.  I only have the one that Judge Passamano wrote up on, but we're going to have to get an order to the school apparently because the school is tied into all this.  And I'll give you a return date now.  And as I presiding judge, I have a little more flexibility than the other judges because I don't have a necessarily (indiscernible) calendar.  I'm out of the office quite a bit, but I will make myself available, again, a day or two upon receipt of the report and I will put in the order -- do you have a blank copy or another copy what you submitted to Judge Passamano?

MS. TOROSIAN:  I don't have a blank one.  Do

you have one?

MR. CLARK:  No.

THE COURT:  Maybe there's an extra copy in the submissions.

MR. CLARK:  Your Honor, could I --

THE COURT:  Yes, I'll -- I'll listen to you.

MR. CLARK:  -- briefly?

THE COURT:  Of course.

MR. CLARK:  I would just -- I mean, obviously, I understand what the Court is saying. Would the Court be willing to --

THE COURT:  I do have a copy.

MR. CLARK:  -- would the Court be willing to consider some sort of visitation, even if it were a supervised visitation in context --

THE COURT:  I would consider that.  What do you propose?  Is there a third party that both parties trust?  For a visitation, sometimes you have an in-law or you have a neighbor.  I don't know what's happening in this case necessarily, but certainly if you come up with a third party.  We also have a court-supervised program.  Takes a little while to get that up and going, but I -- I would much welcome, so we can get this going sooner, a third party if you can recommend someone and discuss it with counsel.  And, you know, we

don't put a third party -- we don't force a third party to an uncomfortable situation, but sometimes there's in-laws, friends, or, you know, members of a church, for --

MR. CLARK:  Right.

THE COURT:  -- instance, that knows -- know the family that will be willing to supervise and if you have anything like that, I would suggest a neighbor, too, you can engage that discussion with counsel.  But the answer to your question is yes, --

MR. CLARK:  Okay.

THE COURT:  -- I would most certainly --

MR. CLARK:  Thank you, Your Honor.

THE COURT:  -- consider something along those lines.

MR. CLARK:  So -- so I'll certainly discuss that with counsel after court and --

THE COURT:  In fact, I'll put that in the order --

MR. CLARK:  Okay, great.

THE COURT:  -- for counsel to confer in good faith on whether or not there is a third party who is comfortable and -- and, again, that the parties trust to facilitate visitation.

MR. CLARK:  Thank you, Your Honor.

THE COURT:  It's an excellent suggestion and certainly I think if we have a third party, there's no -- I don't see any harm or danger or risk if it's someone that's agreeable to both sides.

MR. CLARK:  Yes, Your Honor.  Thank you.

THE COURT:  Okay, all right, let me just look at this order now.

(Pause in Hearing)

MR. CLARK:  And, again, Your Honor, I don't mean to interrupt the Court.  I know you're --

THE COURT:  I'm listening to you.

MR. CLARK:  -- you're working.

THE COURT:  Sure.

MR. CLARK:  Mr. Malhan was just -- maybe if -- if we can agree today.  What he -- what he was suggesting was, and why I think it's a good idea, is he would normally have them after school Monday through Friday, that the supervised visitation could be something like three or four hours, he could have them for dinner, and then they can be returned to -- to the mother.

THE COURT:  I will put something like that in the order.  It's, again, subject to the convenience of a third party --

MR. CLARK:  Right, of course.

THE COURT: -- and I, you know, will be willing to, if I need to, take a phone conference if you can't work it out. But I don't want to start restricting the third parties what they can and can't do.

MR. CLARK: Right.

THE COURT: What I'm just expressing is I expect all parties to work in good faith as long as the safety concerns are addressed, but I don't want to -- you're going to have agree with a third party what they're willing to do.

MR. CLARK: Right, of course.

THE COURT: Okay.

(Pause in Hearing)

THE COURT: There's no restraining order between the parties; correct?

MR. CLARK: Well, yes and no, Your Honor. Because there's a --

THE COURT: What's that mean?

MR. CLARK: -- there's a criminal case pending we talked about. As a condition of release, Mr. Malhan is directed not to have contact with Ms. Myronova.

THE COURT: What is this -- is this a contempt case or something?

MR. CLARK:  No.  No, this is --

THE COURT:  Was there a restraining order that was violated?

MR. CLARK:  No.

THE COURT:  What kind of criminal case do we have then?

MR. CLARK:  All right, so here's the background to try and sum it up.  Mr. Malhan filed suit in Federal Court challenging the harassment statute as unconstitutional back in November because this New York Court of Appeals had a model statute that was virtually identical --

THE COURT:  The 2C:33-4 in New Jersey?

MR. CLARK:  I believe that's the one, Your Honor.

THE COURT:  Deemed unconstitutional?

MR. CLARK:  Yes, there was a model statute. It was almost verbatim.  There's like two words changed or something.  In any case, Mr. Malhan got wind that Ms. Myronova had filed -- had -- had made a complaint with the police.  He filed in Federal Court.  I'm actually representing him in Federal Court.  Several months later, the State actually did charge him.  So those charges are pending.

THE COURT:  With criminal harassment?

MR. CLARK:  Correct, harassment and stalking.

THE COURT:  Under DV laws?

MR. CLARK:  Well, it would be considered a DV offense, correct.

THE COURT:  So and then he allegedly violated the DV order?

MR. CLARK:  No.  No, Your Honor.

THE COURT:  So where does the criminal case --

MR. CLARK:  Well, well, --

THE COURT:  -- come in?

MR. CLARK:  -- what I should -- the criminal case is harassment stalking.  So that's -- he's charged with --

THE COURT:  In a DV context or in the violation of a restraining order context?

MR. CLARK:  No, not in -- just -- just in the context that it's classified as a domestic violence offense because of the history, but it's -- it's -- it's just a pure --

THE COURT:  Who's the plaintiff in that case?

MR. CLARK:  The State of New Jersey.

THE COURT:  And it's -- do you have a docket number?

MR. CLARK:  I don't have it with me.

64

THE COURT:  Is it FO or is it C for criminal?

MR. CLARK:  No, it's a C.  It's a criminal case.  It's --

THE COURT:  Up the hill?  (Indiscernible) court?

MR. CLARK:  No, it's in Hudson County Court in front of Judge Royster.

THE COURT:  Okay.

MR. CLARK:  So it's, again, it's a little unusual.

MS. TOROSIAN:  Your Honor, the exhibit 2, the Order of Dismissal regarding a temporary restraining order, --

THE COURT:  Yes.

MS. TOROSIAN:  -- and correct me if I'm wrong because I wasn't involved in the case at that point, but when -- when this order was issued vacating the TRO, subsequent to that is when the Hudson County Prosecutor's Office went ahead --

THE COURT:  I'm sorry.  Follow -- run that by me one more time, please.

MS. TOROSIAN:  So subsequent to this order --

THE COURT:  Dismissing the --

MS. TOROSIAN:  Dismissing the TRO.

THE COURT:  -- TRO.

MS. TOROSIAN:  I believe Hudson County Prosecutor's Office went ahead and charged Mr. Malhan with the stalking and the harassment and then he --

THE COURT:  While the order was in place?

MS. TOROSIAN:  No.

MR. CLARK:  No.

MS. TOROSIAN:  No.  Once this case was done.

THE COURT:  No, but the -- the violation occurred while the order was in place.  He was charged afterwards, but was it for conduct that occurred while the restraining order was in place?

MS. TOROSIAN:  No.

MR. CLARK:  No, Your Honor.

MS. TOROSIAN:  So what --

THE COURT:  Okay.

MS. TOROSIAN:  -- happened was subsequent to this vacation and dismissal, the Hudson County Prosecutor's Office went ahead and filed charges against Mr. Malhan for the stalking and harassment and then there was a grand jury indictment and there was a hearing scheduled, if I'm not -- if I'm not mistaken, and Mr. Clark contends that Mr. Malhan did not have notice of that hearing and that's when -- when he didn't appear, that's when a warrant for his arrest was issued; correct?

MR. CLARK:  Right, that's correct.

MS. TOROSIAN:  And so that's how we got to where --

THE COURT:  Okay.

MS. TOROSIAN:  -- we got to.

THE COURT:  Thanks for clarifying that. How's your case going challenging 2C:33-4?

MR. CLARK:  Well, it's -- it -- it's going forward.  We had a meeting this week and, you know, we're still doing discovery and, well, we're trying to sort out some things, but it's largely a legal issue. But, again, as I've indicated, as Your Honor might be familiar with the harassment statute is very, very broad and, again, we think we're on pretty good terms since the New York Court of Appeals ruled on the (indiscernible) that it was unconstitutional.  So -- so we'll see, but it is moving forward.

THE COURT:  All right.

MR. CLARK:  Okay, Your Honor, just -- just so the Court is aware, Mr. Malhan is reminding me that because of this criminal no contact, all the transfers have been at the Bayonne Police Station.  And that --

THE COURT:  Transcripts?

MR. CLARK:  Transfers.

THE COURT:  Transfers.

MR. CLARK:  Transfers of custody.

THE COURT:  But that's -- I thought they -- I thought they did it at school so there would be no --

MR. CLARK:  Well, right, --

THE COURT:  -- interaction.

MR. CLARK:  -- but when there's not -- when it's not at the school they would do Bayonne.

THE COURT:  Okay.

MR. CLARK:  So that's just the alternative. So, again, I don't know if Your Honor needs to put that in anything, but --

THE COURT:  I'll tell you what I did in a second, but let's get a date to come back within 30 days --

MR. CLARK:  Okay.

THE COURT:  -- and I -- and if I get the report, I'll call you sooner, okay.  So today is the 12th.  That's Columbus week in October and I'm away that week, so let's get you in the week before.  Maybe the 6th; does that work?

MS. TOROSIAN:  And this is based upon the report --

THE COURT:  Yes, being here.

MS. TOROSIAN:  -- being here.  Okay.

THE COURT:  Okay, so are you all available on

the 6th?  I do try to respect schedules as much as possible.

MR. CLARK:  Yes, Your Honor.  I'm just trying to check my schedule real quick, see if I have anything that date.

THE COURT:  Good?

MR. CLARK:  Just --

THE COURT:  If not, I'll pick another date.

MS. TOROSIAN:  October 6th is fine for me, Your Honor.

MR. CLARK:  Just trying to -- yes, it looks like October 6th is fine for me, Your Honor.

THE COURT:  Can I get you here 9:30 punctually?

MR. CLARK:  Yes.

MS. TOROSIAN:  Sure.

MR. CLARK:  Yes.

MS. TOROSIAN:  Yes.

THE COURT:  Okay, can you write that down actually?

COURT CLERK:  Mmm-hmm.

THE COURT:  All right, let me read this order to you, see if you have any correct -- any comments.  And as I said, I'll see what the status of Judge Kessler is and then maybe I'll go into some case

management conferences and see where we are with this case.  It's tracking, obviously, you know, it's a backlog case.  It's been around I think you said 2011.

MS. TOROSIAN:  Correct, Your Honor.

THE COURT:  All right, so the order provides simply, I don't mean to say simply because obviously I'm not minimizing it, but it's straightforward, that

"Parenting time with the parties children are hereby suspended pending the outcome of the DCPP investigation or completion of its report including any psychological evaluation.  Plaintiff's granted temporary sole and physical custody of the parties' two minor children until further order of the Court.

DCPP to provide its report forthwith to the Court in-camera.  The evaluation of defendant, as agreed to by defendant, shall be undertaken as soon as possible with the evaluation provided to the Court in-camera.

Parties to confer through counsel as to whether a third party may be agreed upon to supervise visitation if said third party is available, if you agree on someone.  And if the parties cannot agree on the parameters, including but not limited to Bayonne Police Department, but if you can't agree on all that, then come back and see me."

70

Okay?

MR. CLARK:  Yes, Your Honor.

THE COURT:  So there's two contingencies on there.  One, that you have somebody, and if you have somebody and you agree, you know, you don't need to come back and see me.

MR. CLARK:  Right.

THE COURT:  If you have someone and you can't agree, come back and see me, okay.

MR. CLARK:  Understood.

THE COURT:  Parties to appear 10/6/17 at 9:30 a.m.  Okay, we'll sign this order, we'll process it, and I'll see you on October 6th, if not before then.

MS. TOROSIAN:  Thank you, Your Honor.

THE COURT:  Okay, all right, just wait patiently.  Ms. Chilious will file the order and then we'll get copies for you and you can certainly be on your way at that point, all right.

Now, Officer, it's not clear to me -- clearly there's no FRO in place, but there is some type of no-contact, so if you can please make sure they escort -- make -- make sure they depart appropriately.

COURT OFFICER:  Yes, no problem.

THE COURT:  I would be thankful.  Okay, all right, thank you for your time.

MR. CLARK:  Thank you, Your Honor.

MS. TOROSIAN:  Thank you, Your Honor.

COURT OFFICER:  Plaintiff side, you guys can wait outside the courtroom.  We'll bring the order. You can leave first and then I'll give you a couple minutes to head out.

MS. TOROSIAN:  All right, thank you.

COURT OFFICER:  And once you get on the elevator, then the second party can leave.

MS. TOROSIAN:  Thank you.

(Proceeding concluded at 4:46:35 p.m.)

* * * *

CERTIFICATION

I, Laura Scicutella, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, Index No. from 3:34:38 to 4:46:35, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings, as recorded.


/s/ Laura Scicutella                    AD/T 685
Laura Scicutella                        AOC Number

Phoenix Transcription LLC               10/24/17
Agency Name                             Date